## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

reVamped LLC, Heliocentrix LLC, *Minnesota limited liability companies;* Tammy Grubbs; and Vanda Smrkovski;

       Plaintiffs,

v.

City of Pipestone, *a Minnesota municipality*; and Doug Fortune, *in his individual and official capacities;*

       Defendants.

File No. 22-CV-02881 (JMB/TNL)

**ORDER**

---

Gregory M. Erickson and Benjamin Paul Lanari, Mohrman, Kaardal & Erickson, P.A., Minneapolis, MN, for Plaintiffs reVamped LLC, Heliocentrix LLC, Tammy Grubbs, and Vanda Smrkovski.

Paul D. Reuvers, Jason J. Kuboushek, and Andrew A. Wolf, Iverson Reuvers, LLC, Bloomington, MN, for Defendants City of Pipestone and Doug Fortune.

---

This matter is before the Court on Plaintiffs reVamped LLC's, Heliocentrix LLC's Tammy Grubbs's and Vanda Smrkovski's (together, Plaintiffs) and Defendants City of Pipestone's (City) and Doug Fortune's (together, Defendants) cross-motions for summary judgment. (Doc. Nos. 46, 65.) In this action, Plaintiffs allege that Defendants violated their procedural due process rights and committed an unconstitutional regulatory taking in violation of the Fifth Amendment by identifying Plaintiffs' hotel as a hazardous building and ordering it to be closed from March 10, 2020, through April 30, 2020. For the reasons explained below, the Court denies Plaintiffs' motion and grants Defendants' motion.

1

## STATEMENT OF UNDISPUTED FACTS

### A.    Regulation of Unsafe and Hazardous Buildings in Pipestone, Minnesota

The City Code of Pipestone, Minnesota (City Code)[1] includes provisions for the closure and vacation of unsafe buildings, consequences for failure to remedy code violations, and for emergency closure of hazardous buildings.   Pipestone City Code [hereinafter, "City Code"] § 151.08(A) ("When a structure or equipment is found by the code official to be unsafe, or when a structure is found unfit for human occupancy, or is found unlawful, such structure shall be condemned pursuant to the provisions of this code."); *id.* § 151.09(A) ("When, in the opinion of the code official, there is imminent danger of failure or collapse of a building or structure which endangers life . . . , then the code official may order and require the occupants to vacate the premises forthwith."). Together, these provisions mirror state-law requirements related to the regulation, closure, vacation, and abatement of unsafe buildings.   *See* Minn. Stat. §§ 463.15–.26 (relating to regulation of hazardous buildings and acquisition of property through exercise of eminent domain); Minn. Admin. R. 1300.0180 (providing authority for ordering a building to be vacated "in case of an emergency" if "continued use is dangerous to life, health, or safety of the occupants").[2]

---

[1] The City Code provides that "[t]he City Council shall appoint an individual to serve as code official."  City Code § 151.03(A).  The parties agree Fortune is a "code official."

[2] The City Code and the state rules do not use the same words to refer to an emergency closure of a building.  *Compare* City Code § 151.08(A) ("condemn"), *with* Minn. Admin. R. 1300.0180 ("vacate").

A property owner may appeal an order of the code official to the City Council and may thereafter seek judicial review. City Code § 151.11(A), (E). In addition, under state rules, if a municipality has no means of appeal, or if no municipal appeals committee hears a "properly completed application for appeal" within ten days, the property owner may appeal to the State Building Code Appeals Board and thereafter seek judicial review. Minn. Admin. R. 1300.0230, subpt. 1.[3]

### B.    Relevant History of the Calumet Inn

The Calumet Inn (Calumet) opened in Pipestone, Minnesota, in 1888 and was added to the National Register of Historic Places in the 1970s. (Doc. No. 50-1 at 3.) In 2012, Heliocentrix purchased the Calumet. (Doc. No. 50-5 at 2; Doc. No. 50-12 at 1; Doc. No. 50-24 at 23:2–5, 23:11–18, 29:2–7.) Vanda Smrkovski is the sole owner of Heliocentrix. (Doc. No. 50-24 at 21:16–19.) Smrkovski operated the Calumet for about three years[4] (Doc. No. 50-12; Doc. No. 50-24 at 29:2–4), until Texas-based Pipestone Lodging, LLC took over. (Doc. No. 50-14.) Heliocentrix and Pipestone Lodging eventually entered into a three-year contract for deed. (Doc. No. 50-24 at 10:1–7, 29:23–30:10; Doc. No. 50-14; Doc. No. 50-15.) However, the Calumet sank into physical disrepair under Pipestone

---

[3] The State Appeals Board advises the public that, "[i]f you disagree with a municipality's decision about application of the State Building Code . . . , you can appeal that decision," and advises that it "hears appeals of building code orders, decisions or determinations where the affected code jurisdiction does not have an appeals board." *State Appeals Board*, Minn. Dep't of Labor & Indus., https://www.dli.mn.gov/about-department/boards-and-councils/state-appeals-board (last visited Dec. 4, 2024) [https://perma.cc/ZX62-NHB8 ].

[4] Smrkovski operated the hotel through another entity, Agora, LLC, which is not a party to this lawsuit. (Doc. No. 50-24 at 21:20–22:1.)

3

Lodging's management.  City of Pipestone Building Inspector Doug Fortune's periodic inspections resulted in code violation notices that went unremedied, which brought the Calumet to the brink of closure more than once.  (*See, e.g.*, Doc. No. 50-16; Doc. No. 50-17; Doc. No. 50-18; Doc. No. 50-19; Doc. No. 50-21; Doc. No. 50-22; Doc. No. 50-24 at 85:9–11.)  By January 2018, Fortune informed the City's Heritage Preservation Commission that the Calumet was "on his blighted list." (*Id.*)

In mid-2018, Pipestone Lodging defaulted under the contract with Heliocentrix, which thereafter resumed operations and hired a contractor to address outstanding code violations and avert shutdown.  (Doc. No. 50-24 at 30:11–33:15; Doc. No. 50-21 at 2–3.) Around this time, Tammy Grubbs—the hotel's then-general manager and a friend of Smrkovski—expressed her desire to purchase the Calumet from Heliocentrix.  In August 2018, Heliocentrix entered into a contract for deed with reVamped, an entity created and solely owned by Grubbs.  (Doc. No. 50-24 at 37:25–38:11; Doc. No. 50-28; Doc. No. 50-29.)  The five-year contract for deed contemplated the sale of the Calumet from Heliocentrix to reVamped.  (Doc. No. 50-24 at 41:7–15; Doc. No. 50-28 at 1, 2; Doc. No. 50-29 at 1.)  While under contract, Grubbs operated the Calumet but Heliocentrix remained its legal owner.  (Doc. Nos. 50-28, 50-29.)

### C.    The 2019 Fire Order

On November 13, 2019, Deputy State Fire Marshal George Shellum conducted a fire inspection at the Calumet.  (Doc. No. 50-31.)  Upon Shellum's arrival at the Calumet, he met Chris de Gruchy, Grubbs's adult son who worked at the Calumet as the kitchen manager.  (Doc. No. 50-32 at 31:10–14; Doc. No. 50-35 at 8:18–25, 10:3–4; Doc. No. 50-

4

38 at 10:8–12.)  Following the inspection, Shellum issued an Inspection and Compliance Order (2019 Fire Order) to the Calumet.  (Doc. No. 50-31; Doc. No. 50-42 at 2.)  It listed nine fire code violations, provided guidance for how to remedy each violation, noted the time by which repairs were to be completed, and requested "valid documentation of compliance."  (*Id.* at 2.)  The following day, Shellum put the building "on Fire Watch" due to a malfunction in the Calumet's fire alarm system.  (Doc. No. 50-33.)  De Gruchy testified that throughout November or December 2019, he and Grubbs "split" up action items,[5] aiming to complete them "[i]mmediately" or "[a]s soon as possible."  (Doc. No. 50-35 at 21:14–25.)  De Gruchy also testified that, as he cleared an item, he reached out to Shellum and notified Grubbs.  (*See* Doc. No. 50-35 at 29:3–7; Doc. No. 50-33; Doc. No. 50-34.)

Then, in early January 2020, when de Gruchy was on the fourth floor of the Calumet, he smelled smoke and heard the fire alarm.  (Doc. Nos. 50-36, 50-37.)  After observing smoke coming from beneath a door to a room on the fourth floor, de Gruchy unlocked the door and used a fire extinguisher to put out the fire.  (Doc. No. 50-37; Doc. No. 50-35 at 33:2–7.)  The sprinklers in the room had not turned on, and there were two children present in the room at the time of the fire.  (Doc. No. 50-35 at 33:16–18.)

On February 20, 2020, Shellum sent de Gruchy an email noting that notice of compliance with the 2019 Fire Order was overdue.  (Doc. No. 50-42 at 3.)  De Gruchy

---

[5] For her part, Grubbs testified that she did not see the 2019 Fire Order until March 2020. (Doc. No. 50-38 at 72:5–73:5.)  However, de Gruchy testified that he refused to sign an affidavit prepared by Plaintiffs' counsel in this litigation that represented that de Gruchy and Grubbs never reviewed the 2019 Fire Order until March 2020 because it was not true. (Doc. No. 50-35 at 37:15–18.)

responded and informed Shellum that he "no longer work[s] for the Calumet"[6] and that he "passed all info along to Tammy Grubbs." (*Id.* at 1–2.) Shellum then forwarded the email chain, attaching a copy of the 2019 Fire Order, to a defunct email address that he believed belonged to Grubbs. (*See id.* at 1.)

### D.    Emergency Closure of the Calumet

Fortune testified that, on March 5, 2020, Shellum contacted him regarding the failure of Calumet's sprinklers to deploy during the January fire and inquired whether Fortune had ever closed down a building in Pipestone. (Doc. No. 50-48 at 136:7–137:16.) That same day, Shellum also contacted Southwest Health and Human Services Environmental Health Manager John Kloss (i.e., the health inspector) about the Calumet's unremedied fire-code violations and to inform him that the hotel's sprinklers did not deploy during the January 2 fire. (*See* Doc. No. 50-43; Doc. No. 50-46 at 1.)

On March 6, 2020, Kloss contacted Grubbs by letter regarding overdue items on the 2019 Fire Order. (Doc. No. 50-43.) He advised Grubbs that unremedied violations may require the health inspector to close the hotel, and he also noted, in bolded text, as follows:

> George Shellum, Deputy State Fire Marshal Inspector, will be conducting an inspection on Monday, March 9 to assess the fire safety measures in this establishment. Be advised that failure to comply with the orders issued on the fire marshal inspection report by the specified date will result in emergency closure of your hotel.

---

[6] De Gruchy left employment with the Calumet around January 2020; he and Grubbs have not spoken since his departure. (Doc. No. 50-47.)

(*Id.*)  He also enclosed a copy of the 2019 Fire Order.  (*Id.*)  Despite Grubbs's claim that she had never before seen the 2019 Fire Order, Shellum informed Grubbs that the upcoming March 9 inspection would proceed as planned.  (Doc. No. 50-44 at 2–3.)

On March 9, 2020, Shellum, Fortune, and Kloss conducted their inspection.  (Doc. No. 50-38 at 76:11–14; Doc. No. 45 at 47:15–17.)  Shellum identified five items from the 2019 Fire Order that had not been remedied.  (Doc. No. 50-45; Doc. No. 50-46.)  He also identified eight new violations that required correction within specified time periods of seven to thirty days.  (Doc. No. 50-45; Doc. No. 50-46.)  The next day, Fortune issued a notice (Building Closure Order), which read as follows:

> After the [March 9] inspection was completed it was determined that the [C]alumet Hotel is a "distinct fire hazard." Per the current Minnesota Building Code and State Fire Code the hotel is **CONDEMNED**.  With that determination all occupants must vacate the premises by 5:00 PM March 10, 2020.
>
> Minnesota Administrative Rule 1300.0180 states: "A building or structure regulated by the code is unsafe, for the purposes of this part, if it is structurally unsafe, not provided with adequate egress, **a fire hazard,** or otherwise dangerous to human life." It further states: "The building official **<u>SHALL</u>** order any building or portion of a building to be vacated if continued use is dangerous to life, health, or safety of the occupants[.]

(Doc. No. 50-47 at 2 (emphasis in original); Doc. No. 50-47.)  The Building Closure Order then set forth a checklist of code violations that had to be abated before the Calumet could reopen.  (Doc. No. 50-47 at 2–3.)  Fortune testified that, during the March 9 inspection, he observed hazardous conditions on the property, which caused him to conclude that "what I saw doing the inspection with George Shellum endangered life."  (Doc. No. 50-47 at

159:6–10.) Fortune testified that he did not want to "tak[e] that chance on the life, safety and health of the occupants of that building," he viewed his options as either "have the hazard removed or the occupants removed from the hazard," and he chose the latter. (Doc. No. 50-48 at 88:12–15; 89:9–11; *see also id.* at 47:15–18, 93:22–94:2; 143:22–144:1, 159:6–10.) He viewed the hazards as "not just the fire stuff, but some of the structural stuff that I saw that I thought the building needed to be closed." (Doc. No. 50-48 at 54:9–11.)

### E.    Disagreement with the Building Closure Order

On March 20, 2020, Plaintiffs' counsel sent a nineteen-page document to the Pipestone City attorney,[7] and asked that it be circulated to the entire Pipestone City Council. (*See* Doc. No. 69 ¶ 500.) Three days later, Plaintiffs' counsel attended a City Council meeting. (Pipestone City Council Meeting, March 23, 2020, at 1.)[8] Meeting minutes show that "the purpose for the special meeting was to discuss the Calumet Inn and the COVID-19 Pandemic." (*Id.*) The minutes also reflect that Plaintiffs' counsel "disputed the process by which the Calumet was closed by the City," that he threatened litigation in federal court, and "requested that a meeting of the Board of Appeals be scheduled." (*Id.*; *see also* Doc. No. 69 ¶ 499.) The minutes neither reflect any motions or resolutions relating

---

[7] The contents of this document are unknown because the parties did not submit it in support of their summary judgment motions, and, to the Court's knowledge, it does not appear elsewhere in the record.

[8] The meeting minutes from the March 23, 2020 City Council meeting can be accessed at https://www.progressivepipestone.com/AgendaCenter/ViewFile/Agenda/_03232020-342. [https://perma.cc/TE8N-8BPA]. The Court may take judicial notice of public records. *Levy v. Ohl*, 477 F.3d 988, 991 (8th Cir. 2007); *Stutzka v. McCarville*, 420 F.3d 757, 761 n.2 (8th Cir. 2005).

to the Calumet nor any vote concerning the Building Closure Order. (*See* Pipestone City Council Meeting, March 23, 2020, at 1.)

Then, by letter dated April 13, 2020 (more than one month after Fortune issued the Building Closure Order),[9] Pipestone's City Attorney advised Plaintiffs to perfect an appeal with the Minnesota Department of Labor and Industry if they desired to dispute or appeal the Building Closure Order, as follows:

> [The Pipestone] City Code does not provide for—via its Board of Appeals and Adjustments—an appeal of a violation of than one of zoning or land-use regulation. Additionally, the COVID-19 pandemic-flu emergency declarations have hindered any convening, within 10 days, or an appeal hearing as would allow due process, full opportunity to be heard, and composition of a record in a manner as can be cogently, fully reviewed whether by a court or another body.
>
> . . .
>
> Accordingly, on behalf of the City of Pipestone, I suggest that your client as soon as possible file and perfect an appeal with the Minnesota Department of Labor & Industry. The necessary forms for this are enclosed, as are the four requisites as detailed in the City's correspondence of April 8, 2020, and Affidavit of Mailing of all of these.

(Doc. No. 81-1 at 13–14.) Plaintiffs' counsel prepared an appeal packet to the state Board of Appeals on April 28, 2020, but never submitted it. (*See* Doc. No. 81-1 at 2–12.)

On April 30, 2020, Fortune determined that the Calumet had remedied the code violations such that condemnation placards on the building could be removed. (Doc. No.

---

[9] In a sworn declaration, Smrkovski references—but does not attach—additional communications between Plaintiffs' counsel and City officials in the days after the March 23, 2020 City Council meeting. (*See* Doc. No. 69 ¶¶ 499–516.)

50-54; *see also* Doc. No. 50-52; Doc. No. 50-53.)  Grubbs arranged for Kloss's reinspection on November 5, 2020, at which point he reissued the relevant licenses to operate.  (Doc. No. 50-59.)  However, on May 6, 2022, the Calumet posted on Facebook that it would be closing indefinitely.  (Doc. No. 50-67.)  It remains closed today.

### F.    This Action

On November 10, 2022, Plaintiffs[10] filed this action.  In Count I of their two-count Amended Complaint, Plaintiffs assert a claim under 42 U.S.C. § 1983, in which they allege that Fortune and the City violated their procedural due process rights under the Fourteenth Amendment by depriving them of adequate process before and after issuing the Building Closure Order.  In Count II, they allege that Defendants engaged in an uncompensated regulatory taking in violation of the Fifth Amendment by ordering the Calumet to close from March 10 through April 30, 2020.

## DISCUSSION

The parties now bring cross-motions for summary judgment.  (Doc. Nos. 46, 65.)  Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The substantive law determines which facts are "material" and which are irrelevant: material facts are those whose resolution affects the outcome of the case.

---

[10] Smrkovski and Grubbs are named plaintiffs in this action.  However, in the briefing on the pending motions, Plaintiffs concede that Smrkovski and Grubbs, as individuals, have no legal interest in this dispute and, thus, no Article III standing.  (Doc. No. 80 at 41–42; *see also* Doc. No. 48 at 15–16.)

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To survive the motion, a non-

moving party must demonstrate the existence of specific facts in the record which create a

genuine issue for trial.  *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  As

is normally the case in a summary judgment motion, all justifiable inferences are to be

drawn in the non-moving party's favor, *Anderson*, 477 U.S. at 255, meaning that the Court

views the record in the light most favorable to Defendants when considering Plaintiffs'

motion, and in the light most favorable to Plaintiffs when considering Defendants' motion.

*See, e.g.*, *Fjelstad v. State Farm Ins. Co.*, 845 F. Supp. 2d 981, 984 (D. Minn. 2012).

## I.    COUNT I: PROCEDURAL DUE PROCESS

Although the Complaint and Plaintiffs' legal memoranda are not very precise, the

Court determines that Plaintiffs advance the following three theories of liability against

Defendants in Count I: (1) the City deprived Plaintiffs of procedural due process because

it did not consider an appeal of the Building Closure Order;[11] (2) the City and Fortune, in

---

[11] A municipality such as the City "can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue," as opposed to the actions of a tortfeasor the municipality employs.  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989); *see also Webb v. City of Maplewood*, 889 F.3d 483, 487 (8th Cir. 2018) ("[T]here must be an unconstitutional act by a municipal employee before a municipality can be held liable.").  More precisely, a municipality may be liable under section 1983 under any of the following four circumstances: (1) an official municipal policy violates the constitution; (2) an authorized municipal representative directs another employee to take unconstitutional action; (3) an unwritten custom, that violates the constitution, is so widespread that it has the force of law; and (4) the municipality fails to train or supervise municipal employees.  *See Atkinson v. City of Mountain View*, 709 F.3d 1201, 1214 (8th Cir. 2013) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) for the proposition that a municipality may be liable under section 1983 if the constitutional violation resulted from "an official municipal policy" or "an unofficial custom," and citing *Canton* for the proposition that a municipality may be liable if the constitutional violation resulted from "a deliberately indifferent failure to train or supervise") (quotations omitted);

his official capacity, deprived Plaintiffs of procedural due process by not providing Plaintiffs with an opportunity to remedy the safety concerns identified in the Building Closure Order prior the closure of the Calumet; and (3) Fortune, in his individual capacity, deprived Plaintiffs of procedural due process through the actions that he took leading up to and including issuing the Building Closure Order. The Court analyzes each of these three theories in turn and ultimately concludes that none of Plaintiffs' theories survive Defendants' motion because, as defendants argue, they are contrary to law, contrary to the factual record presented to the Court, or both.

### A.    Sufficiency of Procedures for Appeal of the Building Closure Order

Plaintiffs argue that the City deprived them of their constitutional due process rights to post-closure due process (i.e., the right to appeal the substantive merits of the Building Closure Order). However, as discussed below, this argument overlooks the avenues of review available to Plaintiffs, which are constitutionally sufficient as a matter of law.

Procedural due process constrains government decisions "which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the

---

*see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986) (explaining that a municipality may be liable under section 1983 if an authorized decisionmaker directed a particular unconstitutional course of action that resulted in the complained-of injury).

In this case, Plaintiffs do not raise a *Pembaur* variety of municipal liability. In addition, to the extent that any factual statements from the Amended Complaint could be construed as asserting an "unwritten custom" or "failure to supervise" variety of municipal liability, no party developed any arguments to suggest that such claims remain at issue. Accordingly, the Court construes Plaintiffs' arguments as advancing only one theory of municipal liability regarding an appeal or review of the Building Closure Order: that the City had official policies precluding appeal or review of the Building Closure Order.

Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). Under *Mathews*, courts balance the following three factors to determine the required procedural protections: (1) the private interest affected by the official action; (2) "the risk of an erroneous deprivation of such interest through the procedures used" and the probable value of additional procedure safeguards; and (3) the government's interest, "including the fiscal or administrative burdens" of additional procedures. *Mathews*, 424 U.S. at 321.

### 1.    *The Private Interest Affected*

Defendants initially took a conciliatory position concerning the first prong of the *Mathews* balancing test, noting that "[c]losing the Calumet . . . implicates procedural due process." (Doc. No. 48 at 17.) Subsequently, however, Defendants argued that the Building Closure Order did not impact any of Plaintiffs' constitutionally protected property interests. (Doc. No. 74 at 10–13.) For purposes of its analysis here, the Court assumes without deciding that Plaintiffs have identified a protected property interest.

### 2.    *The Risk of Erroneous Deprivation*

Plaintiffs assert that city policy prevented them from appealing the Building Closure Order. The Court, however, disagrees for several reasons.

First, pursuant to the City Code, all parties whose property interests have been affected by a building closure decision have a right to appeal that decision to the Pipestone City Council:

> Any person directly affected by a decision of the code official, or a notice or order issued under this code shall have the right to appeal to the City Council provided that a written application for appeal is filed within 20 days after the day the decision, notice, or order was served. An application for

13

appeal shall be based on a claim that the true intent of this code
or the rules legally adopted hereunder have been incorrectly
interpreted, the provisions of this code do not fully apply, or
the requirements of this code are adequately satisfied by other
means.

City Code § 151.11(A) (concerning appeals of building closure decisions due to failure to
remedy code violations under section 151.08 and due to emergency decisions in the event
of imminent danger under section 151.09).

The appeal hearing contemplated by City Code § 151.11(A) includes several
procedural protections. For instance, after receiving "[a]n application for appeal," the
Pipestone City Council must follow the statutory open meeting notice requirements and
schedule a time to hear the appeal: "The City Council shall meet to hear the appeal upon
proper notice as determined by M.S. Chapter 13D et seq." *Id.* § 151.11(B).[12] In addition,
among other procedural provisions, the City Code sets forth evidentiary requirements and
establishes which individuals "shall be given an opportunity to be heard" at the appeal
hearing. *Id.* § 151.11(C). Importantly, any modification or reversal of the building closure
decision can only occur "by a vote of a majority of the total number of Council members,"
and that decision "shall be recorded," with copies "furnished to the appellant and the code
official," who is required "to take immediate action in accordance with the decision of the
City Council." *Id.* § 151.11(D).

---

[12] Among other requirements, the open meeting statute provides that for any special
meetings, "the public body shall post written notice of the date, time, place, and purpose
of the meeting . . . ." Minn. Stat. § 13D.04, subd. 2.

14

Second, Minnesota state law provides for appeals to the State Building Code Appeals Board. Administrative Rules specifically mandate that if a municipal appellate board has not held an appeal hearing "within ten working days from the date the municipality receives a properly completed application for appeal . . . the applicant may appeal directly to the State Building Code Appeals Board." Minn. Admin. R. 1300.0230, subpt. 1.

Third, both the City Code and state law provide for judicial review of building closure decisions by writ of certiorari.[13] City Code § 151.11(E) ("Any person, whether or not a previous party of the appeal, shall have the right to apply to the appropriate court for a writ of certiorari to correct errors of law."); *Khan v. City of Minneapolis*, No. A12-1424, 2013 WL 2371807, at *1 (Minn. App. June 3, 2013) (observing that property owners may challenge a municipality's decision to condemn and demolish property by writ of certiorari and concluding that the city improperly considered evidence at the municipal appeal hearing in violation of the city code); *A & M Prop. Servs., LLC v. City of Minneapolis*, No. A12-0007, 2012 WL 5990237, at *1 (Minn. App. Dec. 3, 2012) (upholding a municipality's condemnation order on certiorari review and affirming the district court's

---

[13] In addition, parties commencing an inverse condemnation proceeding or challenging a municipality's interpretation of law—including claims that a municipality failed to comply with its code or state law—may seek compliance through a writ of mandamus. *E.g.*, Minn. Stat. § 586.01; *see also N. States Power Co. v. Minn. Metro. Council*, 684 N.W.2d 485, 491 (Minn. 2004). There is no indication in this record that Plaintiffs sought a writ of mandamus compelling the Pipestone City Council to review the Building Closure Order.

15

determination that the municipality did not deprive the property owner of procedural due process under the U.S. Constitution).

Plaintiffs could have sought review of Fortune's basis for and decision to issue the Building Closure Order by submitting "an application for appeal" to the Pipestone City Council, by submitting "a properly completed application for appeal" to the State Building Code Appeals Board, or by seeking certiorari review (or judicial review through a writ of mandamus) of any appeal proceedings that did occur.

As noted above, Plaintiffs' arguments to this Court are not very precise, but to the extent that Plaintiffs separately argue that, as a factual matter, the City prevented them from appealing the Building Closure Order, the Court disagrees. None of the parties submitted the nineteen-page document that Plaintiffs provided to the Pipestone City attorney, so the Court cannot definitively determine whether this document constitutes "an application for appeal" pursuant to City Code § 151.11(A). But the record is clear and undisputed that the Pipestone City Council never convened an appeal hearing pursuant to City Code § 151.11(A). Though the City Council met on March 23, 2020, thirteen days after the issuance of the Building Closure Order, and although the agenda included a discussion of the fact that Plaintiffs "disputed the process by which the Calumet was closed by the City," the meeting minutes do not reflect that an appeal proceeding took place at this meeting. (Pipestone City Council Meeting, March 23, 2020, at 1.) No vote concerning whether to uphold, modify, or reverse the Building Closure Order is recorded. (*Id.*) Moreover, Plaintiffs describe this meeting as "not an appeal." (Doc. No. 68 at 35.) Thus, the record does not support any inference that Plaintiffs invoked the appeal process set forth in City

16

Code § 151.11(A).  Likewise, although Plaintiffs' counsel prepared an appeal packet to the state Board of Appeals, Plaintiffs never submitted it and, therefore, never invoked the administrative appeal process set forth in Minnesota Administrative Rule 1300.0230.  (*See* Doc. No. 81-1 at 2–12.)  Finally, there was no request for certiorari review (or a request for a writ of mandamus) concerning the March 23, 2020 meeting, or the April 13, 2020 letter, in which the Pipestone City Attorney advised Plaintiffs' Council to seek review through Rule 1300.0230.

Further, Plaintiffs make no argument that the appeal processes contemplated by City Code § 151.11(A) or Minnesota Administrative Rule 1300.0230 are constitutionally inadequate.[14]  Plaintiffs also make no argument that certiorari review would be inadequate. Absent any argument and absent any legal authority that procedural due process demands something above and beyond the appellate procedure as contemplated in City Code § 151.11(A), as provided for in Rule 1300.0230, including subsequent certiorari review (none of which Plaintiffs pursued), the Court concludes that as a matter of law, Plaintiffs were very unlikely to experience an erroneous deprivation of their property interest.  Thus, Defendants did not preclude Plaintiffs from exercising any rights of appeal.

---

[14] Though not binding on this Court, the Court acknowledges that Minnesota Court of Appeals concluded that Rule 1300.0230 satisfied the requirements of procedural due process under both the Minnesota and U.S. Constitutions.  *See Hous. First Minn. v. City of Corcoran*, No. A23-1049, 2024 WL 1244047, at *6 (Minn. App. Mar. 25, 2024), *review denied* (June 26, 2024), *cert. denied sub nom.  Hous. First Minn. v. Corcoran, MN*, No. 24-268, 2024 WL 4486403 (U.S. Oct. 15, 2024).

### 3.    *The Burden of Additional Process*

Plaintiffs only argument concerning the third *Mathews* factor is that the burden of allowing an appeal of the Building Closure Order was minimal.  Given the Court's conclusion that multiple avenues of appeal were, in fact, available to Plaintiffs to dispute the merits of the Building Closure Order, this argument is misplaced.

In sum, even assuming that Plaintiffs' property interest is a protected interest under the first *Mathews* factor, on balance, and based on the record presented, the Court concludes there was no procedural due process violation in this case.

### B.    Lack of Constitutional Requirement for Pre-Closure Procedures

Plaintiffs also take issue with the lack of any opportunity to contest the determination that the Calumet was an immediate danger as well as the lack of any opportunity for repair or abatement of any identified hazards.  This argument is also unsupported by legal authority.

Here, it is undisputed that the City Code and state rules provide for an expedited procedure by which to close a hazardous building that does not allow any pre-closure opportunity to be heard.  *See* City Code § 151.09; Minn. Admin. R. 1300.0180.  Plaintiffs do not make a facial attack on the constitutionality of these ordinances and rules.[15]  In fact,

---

[15] In their briefing and at oral argument, Plaintiffs' counsel asserted that the pre-condemnation procedures described in Minnesota Statutes chapter 117, which apply when a government entity condemns property under its eminent domain powers, should have applied in this case.  An eminent-domain condemnation under chapter 117 requires, for example, that the condemning government entity engage in pre-condemnation negotiation and thereafter follow certain judicial procedures involving a petition, hearing, and appeal. *See* Minn. Stat. ch. 117.  However, the City did not condemn the Calumet under its eminent domain powers.  Although the Building Closure Order used the word "condemned" instead

Plaintiffs concede that, under *Gilbert v. Homar*, 520 U.S. 924 (1997), the Constitution allows deprivations of a property interest without any opportunity to be heard: "on many occasions . . . where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause." *Id.* at 930 ("[W]e have rejected the proposition that due process *always* requires the State to provide a hearing prior to the initial deprivation of property." (quotation omitted) (emphasis in original)).

Plaintiffs nevertheless argue that "Fortune knew that there was no need for prompt action, that the action was neither necessary nor justified, and moreover, not necessary to secure an important governmental or general public interest."  (Doc. No. 68 at 20.) However, whether Fortune and the City were correct to conclude that the Calumet presented an immediate danger is irrelevant to the question presented here: whether Plaintiffs deprived of procedural due process to which they were entitled under the U.S. Constitution.  *Parrish v. Mallinger*, 133 F.3d 612, 615 (8th Cir. 1998) (observing that the focus in assessing a procedural due process claim is "not on the merits of a deprivation, but on whether the State circumscribed the deprivation with constitutionally adequate procedures").  The Court is limited to the arguments presented.  Accordingly, absent any argument that *Gilbert* does not extend to the emergency closure provisions set forth in City

---

of "vacated," the Order duly cited the emergency authority under which the closure was made: Rule 1300.0180 of the Minnesota Administrative Rules.  The use of the word "condemned" does not materially affect or otherwise convert the emergency closure that occurred here into a "condemnation" contemplated by chapter 117.

Code § 151.09 and Minnesota Administrative Rule 1300.0180, Plaintiffs have not demonstrated that the Constitution required Fortune or the City to implement additional pre-closure procedures.[16] This is especially true where, as here, Plaintiffs had several post-closure procedures available to ensure that their interests were not erroneously deprived.

### C.    Fortune's Immunity from Suit

The Court also construes Plaintiffs' written submission to assert an independent due process violation against Fortune in his individual capacity.    The Court remains unconvinced by Plaintiffs' arguments because, as noted above, Plaintiffs do not identify a clearly established right that Fortune's actions violated.

As a municipal official, the doctrine of qualified immunity, if applicable, would shield Fortune from liability in his individual capacity.    Courts analyze the applicability of qualified immunity in two steps: first, courts determine "whether the official's conduct

---

[16] To the extent the portions of the Amended Complaint or Plaintiffs' written submission assert a separate section 1983 claim based on the fact that the Building Closure Order did not include a notice of Plaintiffs' avenues of appeal, the Court concludes that such an argument is foreclosed by binding case law.  *See, e.g.*, *City of W. Covina v. Perkins*, 525 U.S. 234, 241 (1999) (concluding that constitutional due process does not require "individualized notice of state-law remedies which, like those at issue here, are established by published, generally available state statutes and case law"); *Grayden v. Rhodes*, 345 F.3d 1225, 1241–42 (11th Cir. 2003) (concluding that notice was constitutionally sufficient where tenants could have referenced city code to determine right to hearing); *Mathews v. Ohio Pub. Empls. Retirement Sys.*, 91 F. Supp. 3d 989, 1005 (S.D. Ohio 2015) (concluding that individualized notice regarding appeal rights was not necessary when such rights were in publicly available state law); *Crum v. Missouri Director of Revenue*, 455 F. Supp. 2d 978, 990 (W.D. Mo. 2006) (concluding that because plaintiffs appeal rights were "established by published, generally available state statutes and case law . . . the Due Process clause of the United States Constitution did not mandate notice to the Plaintiffs of their administrative appeal rights").

violated a constitutional right; and second, courts determine "whether the right was clearly established at the time of the deprivation such that a reasonable official would understand his conduct was unlawful in the situation he confronted." *Ambrose v. Young*, 474 F.3d 1070, 1077 (8th Cir. 2007). Plaintiffs can establish the second prong by identifying "some existing precedent [that] place[s] the question beyond debate," or by showing that the conduct is "so obviously unconstitutional that no precedent is needed." *Dillard v. O'Kelley*, 961 F.3d 1048, 1053 (8th Cir. 2020) (quotation omitted). Courts need not analyze both prongs, *Wimbley v. Cashion*, 588 F.3d 959, 961 (8th Cir. 2009), and ultimately, whether the doctrine applies is a question of law. *Hunter v. Bryant*, 502 U.S. 224, 227–28 (1991).

Here, Plaintiffs do not identify legal authorities to "place the question beyond debate." Plaintiffs rely on a single case, but that case does not involve the constitutionality of any analogous pre-closure action or process involving a code official. Instead, the case cited by Plaintiffs merely reiterates an uncontroversial and general statement of law: "the fundamental requisite of due process of law is the opportunity to be heard." (Doc. No. 80 at 34 (quoting *Grannis v. Ordean*, 234 U.S. 385, 394 (1914)).) As discussed in the preceding section, *Gilbert* allows for emergency action, and Plaintiffs do not identify a clearly established exception to *Gilbert* that applies in this case. Because there is no clearly established right to pre-closure process when a city official issues a closure order under emergency closure authority, such as City Code § 151.09 and Rule 1300.0180, Fortune is entitled to qualified immunity from suit in his individual capacity.

## II.    COUNT II: REGULATORY TAKING

Plaintiffs argue that the temporary closure of the Calumet amounted to a regulatory taking under the Fifth Amendment.  (Doc. No. 48 at 35–39.)  Because prohibiting use of a property to protect public safety is not a taking, the Court also grants Defendants' motion as to this claim, as well.

"[G]overnment regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005).  Assuming that Plaintiffs have identified a protected property interest in their ownership of the real property of the Calumet, s*ee Dukuly v. City of New Hope*, No. 23-CV-3351 (ECT/ECW) 2024 WL 3251733, at *5–6 (D. Minn. June 21, 2024) (concluding that, for purposes of a takings analysis, Minnesota law recognizes a real property interest but does not recognize a party's right to profit streams from a license to operate a business), the Court observes that whether a regulatory takings has occurred typically requires consideration of a three-factor test.  *See, e.g.*, *Northland Baptist Church of St. Paul, Minn. v. Walz*, 530 F. Supp. 3d 790, 816 (D. Minn. Mar. 30, 2021) (citing *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 124 (1978)).

However, it well-established that reasonable building codes and ordinances that permit closure of buildings for public safety reasons do not give rise to constitutional takings.  *Outdoor Graphics, Inc. v. City of Burlington, Iowa*, 103 F.3d 690, 695 (8th Cir. 1996) ("It has long been recognized that reasonable zoning ordinances are generally a lawful exercise of a state's police power to regulate in the interest of public health, comfort, safety, convenience and maintenance of property values." (citation omitted)); *see also*

*Cedar Point Nursery v. Hassid*, 594 U.S. 139, 160 (2021) ("[T]he government owes a landowner no compensation for requiring him to abate a nuisance on his property, because he never had a right to engage in the nuisance in the first place."); *Mugler v. Kansas*, 123 U.S. 623, 668 (1887) ("[P]rohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or appropriation of property."); *Dukuly*, 2024 WL 3251733, at *9; *Zeman v. City of Minneapolis*, 552 N.W.2d 548, 554 (Minn. 1996) ("A harm-prevention regulation, if not a ruse for a state purpose other than protecting the public from noxious harm or illegal activity, is a powerful rationale militating against finding a taking.")

Here, the parties do not dispute the fact that Plaintiffs were unable to conduct business at the Calumet during the period of March 10, 2020, through April 30, 2020, which undoubtedly caused an adverse economic impact—especially for the six days before Governor Walz issued Emergency Executive Order 20-04, which ordered the closure of bars, restaurants, and other places of public accommodation in Minnesota.  *See* Gov. Tim Walz, Emergency Exec. Order 20-04 (Mar. 16, 2020).  It is likewise undisputed that the temporary condemnation was not meant to benefit Fortune, and Plaintiffs do not contend that the code violations cited in the Building Closure Order were pretextual or in excess of the City's lawful regulatory authority.  Further, Plaintiffs do not cite to any legal authority in which a court determined that the exercise of such regulatory authority for public-health and safety reasons or a less-than-two-month closure of a business amounted to a compensable taking under the Fifth Amendment.  (*See* Doc. No. 68 at 30–34.)  The decision

23

to issue the Building Closure Order cannot constitute a taking given the well-established case law permitting the prohibition of property uses that present a danger to the public. Therefore, the Court grants Defendants' motion for summary judgment on Count II.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.    Plaintiffs' motion for summary judgment (Doc. No. 65) is DENIED.

2.    Defendants' motion for summary judgment (Doc. No. 46) is GRANTED and all counts in Plaintiffs' Amended Complaint are DISMISSED.

3.    The pending motions to exclude expert testimony (Doc. Nos. 51, 58) are DENIED as moot.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  December 18, 2024                    /s/ *Jeffrey M. Bryan*
                                             Judge Jeffrey M. Bryan
                                             United States District Court